UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. ALLIANCE FEDERAL CREDIT
UNION,

                         Plaintiff,

            -against-

CUMIS INSURANCE SOCIETY, INC.,

                         Defendant.

MEMORANDUM OPINION
AND ORDER

03 Civ. 10317 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            In this action concerning a claim against an employee fidelity bond,

Defendant Cumis Insurance Society, Inc. has moved for summary judgment on Plaintiff

U.S. Alliance's ("Alliance") two remaining claims[1] and has moved to strike the affidavits

of Robert Ambrose, Richard Murray and Philip Farber.  For the reasons set forth below,

Cumis's motion for summary judgment is granted in part and denied in part, and its

motion to strike is denied as moot.

            As discussed in more detail below, Cumis issued an employee fidelity

bond that protected Alliance from losses caused by the "dishonest acts" of employees

who acted "with the manifest intent to:  (a) Cause [Alliance] to sustain such [a] loss; and

(b) Obtain financial benefit for the 'employee' . . . or for any other person or entity."

(Def. Ex. 50) ("Dishonesty Provision")  The bond also protected Alliance from losses

caused by an employee's "failure to faithfully perform his/her trust," which the bond

_____

[1] On January 8, 2004, Judge Robinson dismissed Alliance's claims alleging bad faith
denial of insurance coverage and a violation of New York Business Law § 349.  This
case was reassigned to this Court on October 21, 2008.

defines as "acting in conscious disregard of [Alliance's] established and enforced share, deposit or lending policies." (Id.) ("Faithfulness Provision")

Alliance's claim against the bond arises from the alleged misconduct of Alliance employee Albert Menard in connection with Prime Time Holdings ("PTH"), a car leasing company in which Alliance invested. Menard served as the liaison between Alliance and PTH. Alliance's investment in PTH began in May 1996 (Def. Ex. 9) and grew from $484,000 in September 1996 to more than $14 million in May 1998. (Def. Exs. 7, 33) PTH collapsed in October 1998, however, causing large losses to Alliance. (Pltf. Ex. 30)

Alliance claims that its losses were caused by Menard's dishonest and unfaithful conduct and seeks recovery under the employee fidelity bond. On June 21, 2002, Alliance filed a proof of loss with Cumis stating that Menard's conduct caused it to suffer losses of $6.9 million. Cumis denied Alliance's claim on April 10, 2003, and this litigation ensued. (Pltf. Ex. 54; Cmplt., ¶ 30)[2]

Cumis has now moved for summary judgment, claiming that Alliance has not offered evidence demonstrating that Menard was dishonest or unfaithful within the meaning of the Dishonesty and Faithfulness Provisions. As explained below, Cumis's motion concerning Alliance's claim under the Dishonesty Provision must be denied, because, inter alia, there are disputed issues of material fact as to whether Menard committed "dishonest acts" and had the "manifest intent" to cause a loss to Alliance and to obtain a benefit for himself. Alliance has offered evidence demonstrating, for

---

[2] Unless otherwise noted, citations to the Complaint concern assertions that are admitted in the Answer, and citations to Cumis's Local Rule 56.1 Statement concern facts that are admitted in Alliance's Local Rule 56.1 counter-statement.

example, that (1) Menard withheld critical information from Alliance concerning the operation of the car leasing program, including the fact that a PTH co-owner had embezzled from PTH but remained in place at the Company; (2) Menard did not disclose to Alliance that PTH had offered Menard an option to purchase a 5% interest in PTH and suggested that he would become CEO of PTH; and (3) Menard went into business with the wife of a PTH principal shortly after he was fired by Alliance and soon bought out the wife's interest on what appears to be highly favorable terms.  With respect to causation, this Court cannot rule as a matter of law that Alliance's losses were not caused by Menard's alleged misconduct, because there are disputed issues of material fact as to whether Alliance would have continued its participation in the leasing program absent Menard's alleged misconduct.

Cumis is entitled to summary judgment on Alliance's claim under the Faithfulness Provision, however, because Alliance has not offered evidence demonstrating that Menard "acted in conscious disregard of [Alliance's] established and enforced share, deposit or lending policies."  (Def. Ex. 50)  Indeed, Alliance has not offered evidence that it had any policies in place concerning its investment in PTH.

Finally, the Court will deny Cumis's motion to strike as moot, because the Court has relied only on admissible evidence in deciding this motion.

## **BACKGROUND**

Alliance is a non-profit financial cooperative established under the Credit Union Act.  (Affidavit of Richard Murray dated July 11, 2006, ¶ 2) ("Murray Aff.")  In 1996, when Alliance first invested in PTH, Menard served as Alliance's vice-president for credit union service organizations ("CUSO").  (Id., ¶ 9)  CUSO's are for-profit

companies created by credit unions to provide services in addition to traditional savings

and loan offerings (Def. R. 56.1 Stat., ¶ 9; Murray Aff., ¶ 2), and the car leasing program

was offered as part of a CUSO.  Menard had had a 30-year relationship with Alliance,

having been a founding member of the credit union and having previously served as a

director, as treasurer and as president.  (Murray Aff., ¶ 10)

I.      **THE WRITTEN AGREEMENTS BETWEEN ALLIANCE AND PTH**

      A.      **The May 13, 1996 Alliance-PTH Agreement**

On May 13, 1996, Alliance and PTH signed an agreement initiating the

car leasing program.  (Def. Ex. 9)  Menard – who executed the agreement for Alliance –

was largely responsible for its terms.  (Def. Ex. 3 at 52:24-53:3; Def. Ex. 9)  Under the

agreement, Alliance agreed to "market PTH's consumer lease services to [its] Members"

and PTH agreed to "offer and enter into vehicle lease agreements with qualified

Members."  (Def. Ex. 9, § 2.0)  The agreement envisioned that PTH would be the legal

owner of the leases and cars, credit union members would be the lessees, and Alliance

would have the option to purchase a 75% interest in each lease.  (Id., §§ 4.0(a), (c))

Under the agreement, Alliance retained the right to "make its own credit decisions in

approving Leases and acquiring interests in Purchase Leases."  (Id., § 4.12)  For each

lease in which Alliance purchased an interest, however, PTH would remit to Alliance a

percentage of the funds it collected from the lessees.  (Id., § 4.2)  The agreement further

provided that a purchase by Alliance of an interest in a lease "constitute[d] a non-

recourse sale to [Alliance]."  (Id., § 4.0(c))

The agreement obligated PTH to provide all services with respect to the

leases and to act "in a fiduciary capacity on behalf of [Alliance] . . . [for the] collection

and distribution of payments[,] . . . [the] distribution of proceeds from the disposition of a

4

Vehicle, and [for] decision-making relating to the handling of defaults under Purchased Leases." (Id., §§ 3.4, 4.0(c))  The agreement also required PTH to ensure that Alliance was the first lienholder on all purchased leases (id., § 4.0(d)), and to provide Alliance with new lease reports, collection reports, termination reports, and delinquency reports. (Id., § 3.5)  Finally, PTH represented that it had "all requisite licenses and governmental authority" to perform under the agreement.  (Id., § 7.0)

Menard had primary responsibility for overseeing the PTH program for Alliance (Murray Aff., ¶ 15), and met with PTH employees every two to three weeks (and sometimes more often) to discuss operations.  (Def. Ex. 3 at 89:12-16)  It is undisputed, however, that other Alliance employees were responsible for determining what leases Alliance would invest in.  (Def. Ex. 1 at 26:2-6, 27:11-23; 29:14-18)  It is likewise undisputed that Alliance never established any policy or criteria for reviewing the creditworthiness of the lessees even though the 1996 agreement provided that Alliance would

> make its own credit decisions in approving Leases and acquiring interests in Purchase Leases . . . [and would] make its own independent determination of the Member's creditworthiness in accordance with the loan policies of [Alliance] and not in reliance on any information, representation or advice from PTH.

(Def. Ex. 9, § 4.12; Def. R. 56.1 Stat. ¶ 4; Def. Exs. 1 at 30:16-19; 2 at 31:17-32:3)[3]

---

[3]  In its response to Defendant's Rule 56.1 Statement, Alliance disputes Cumis's statement "to the extent that it presumes or implies that it was the duty or responsibility of the Board of Directors [of Alliance] to establish such policies."  (Pltf. R. 56. 1 Stat. ¶ 4)  Alliance also asserts that it viewed the Alliance-PTH contracts as "Credit Union policy."  (Id.)  As discussed below, these contracts cannot reasonably be viewed as Alliance lending policies.

**B.**     **The January 23, 1997 Alliance-PTH Agreement**

On January 23, 1997, Alliance entered into a new agreement with PTH that superseded the 1996 agreement. The 1997 agreement was signed by Menard and PTH employee Larry Sobel and differed from the 1996 agreement in only a few material respects. (Def. Exs. 14, 15) First, the 1997 Agreement raised the percentage of interest that Alliance purchased in each approved lease from 75% to 95%. (Def. Ex. 14, § 4.0(a)) Second, the 1997 agreement appeared to offer Alliance greater loss protection, because it changed Alliance's participation from non-recourse to recourse (id., § 4.0(c)); obligated PTH to repurchase Alliance's interest in any lease that was more than 31 days delinquent (id., § 4.14); and required PTH to make deposits into an escrow collateral account based on the amount of outstanding lease payments.[4] (Id., § 4.16)

**C.**     **The May 14, 1998 Amendment and the
           Termination of the Car Leasing Program**

In April 1998, Alliance employee Robert Ambrose discovered that PTH was not fully funding the escrow collateral account as the 1997 agreement required. (Def. Ex. 1 at 125:21-23) By April 30, 1998, the account should have held $2,004,668, but PTH had deposited only $507,322.39. (Def. Ex. 30) Alarmed by this breach, Alliance executives scheduled a meeting with PTH employee Larry Sobel in early May 1998. (Def. Ex. 31)

At the meeting, Sobel explained that the shortfall in the collateral account stemmed from an embezzlement by PTH employee Mark Betz, who had been terminated.

---

[4] For example, for the first $5 million in outstanding leases purchased by Alliance, PTH was required to maintain in an escrow account an amount equivalent to 20% of the outstanding balance concerning these leases. (Def. Ex. 14, § 4.16(b))

(Def. Ex. 1 at 129:4-15)  Sobel showed the Alliance employees a brokerage statement indicating that PTH had funds available to fund the collateral account, but explained that he preferred not to deplete the brokerage account in light of PTH's ongoing negotiations with Betz concerning his separation and termination agreement.  (Id. at 129:16-25)  Sobel offered to make an immediate deposit of $100,000 or $150,000 into the escrow account but asked that PTH be given additional time to address the remaining shortfall.  (Id. at 129:24-130:7)

      After speaking with Sobel, Menard and his Alliance colleagues discussed whether Alliance's funding of PTH should continue.  Menard and Richard Murray – Alliance's chief executive officer – expressed the view that funding should be continued; Robert Canavan, another Alliance executive, opposed continued funding; and Alliance vice president Robert Ambrose expressed "reluctan[ce] to cut off" funding, given that PTH's other payments to Alliance were current and Sobel's claim that PTH would soon rectify the shortfall in the collateral account.  (Id. at 132:3-24; 133:5-11)

      Alliance ultimately decided to continue funding the car leasing program, and on May 14, 1998 (id. at 131:24-132:2), Alliance and PTH amended the 1997 agreement to provide a new timeline for PTH's payments into the escrow collateral account.  (Def. Ex. 32)  Under the May 1998 amendment, PTH agreed to transfer $150,000 into the account immediately and to pay off the balance of the shortfall within 120 days.[5]  (Id.)

---

[5]  Although the amendment provided that PTH had 120 days from May 14, 1998 to fully fund the collateral account, Alliance and PTH appear to have had an understanding that PTH would fund the account by September 30, 1998.  (Def. Ex. 33 at 12; Def. Ex. 40 at 1)

PTH did not address the shortfall in the collateral account by September 30, 1998, however, and Alliance immediately suspended its participation in the car leasing program.  (Def. Ex. 1 at 199:19-22; Def. Ex. 43)  Once Alliance stopped buying interests in PTH's leases, PTH laid off its staff and effectively went out of business. (Pltf. Ex. 30; Affidavit of Robert Ambrose dated July 14, 2006, ¶ 16) ("Ambrose Aff.") After PTH ceased operations on October 19, 1998, Alliance was forced to assume responsibility for the car leasing program.  (Ambrose Aff., ¶ 39; Def. Ex. 43)

Alliance terminated Menard's employment in about April 1999 (Pltf. Ex. 34 at 1416:17-23; Def. Exs. 46, 47), and later secured a $3,750,000 judgment against PTH for breach of contract.  See Prime Time Holdings, LLC v. U.S. Alliance Federal Credit Union, 98 Civ. 17406, 2004 WL 1516181 (N.Y. Sup. Ct. May 13, 2004).

## II.    MENARD'S ALLEGED DISHONEST CONDUCT

In opposing Cumis's motion for summary judgment, Alliance cites a variety of evidence which it contends demonstrates that Menard was dishonest within the meaning of the fidelity bond.[6]

### 1.    Menard's Business Interest in PTH

In the fall of 1996, Sobel told Menard that he should "consider investing in and becoming a part of [PTH]."  (Pltf. Ex. 32 at 396:5-6, 397:13-15)  Sobel told Menard that he was "prepared to offer [him] a five percent interest in [PTH] for $100,000"; Menard believed that he could exercise this option at any time over the next

---

[6]  Alliance relies heavily on certain handwritten notes (Pltf. Exs. 22, 33, and 41) to show Menard's alleged misconduct.  These notes have not been authenticated or even identified by Alliance, however, and it is entirely unclear who wrote them and the circumstances under which they were prepared and maintained.  Because this Court's summary judgment decision must be based on admissible evidence, see Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008), it cannot consider these notes.

two to three years.  (Id. at 397:19-21, 400:16-19)  Sobel also told Menard that he

"anticipated that [Menard] would become chief executive officer of [PTH]."  (Pltf. Ex. 24

at 216:23-217:3)  Menard thanked Sobel for the offer, never rejected it, but also "never

did anything about it."  (Id. at 217:7-14)  Although it is undisputed that Menard never

exercised the option (Def. R. 56.1 Statement, ¶ 7), it is also undisputed that Menard never

told Alliance about Sobel's offer.  (Pltf. Ex. 32 at 405:16-406:6)

> ## 2.    Menard Withholds Information from Alliance and Mischaracterizes PTH's Performance

Alliance alleges that Menard consistently and falsely reported to Alliance

colleagues that the car leasing program was successful when, in truth and almost from the

outset, PTH was experiencing a high delinquency rate and other serious financial

challenges.  (Def. Ex. 48; Murray Aff., ¶¶ 41, 46)  For example, Alliance CEO Murray

testified that Menard made "frequent, often weekly visits to Prime Time's offices . . . and

reported back to Murray, to the executive staff . . . and to the Board of Directors monthly,

that the program was successful and that delinquencies were low." (Murray Aff., ¶ 27)

Similarly, Robert Ambrose, a vice president at Alliance, testified that Menard's reports

"were always very positive" and that Menard claimed "that the program was doing well

and the delinquencies were very low and in line with expectations." (Ambrose Aff., ¶¶ 1,

4)

Alliance also cites evidence indicating that Menard deprived Alliance of

critical, highly negative reports that it was entitled to under its agreement with PTH.

PTH co-owner Sobel testified that shortly after the 1996 agreement was signed, Menard

and Sobel agreed that PTH would not provide any of the reports to Alliance required by

the agreement, including the new lease report, the collection report, the termination report, and the lease delinquency report. (Pltf. Ex. 28 at 236:5-240:12)

        **3.**        <u>**Menard's June 1997 "Surprise Audit"**</u>

Alliance also contends that Menard – in an effort to lull Alliance into a sense of security – announced to CEO Murray on June 23, 1997 that he was conducting a surprise audit of PTH's records.  (Def. Ex. 16)  Menard stated that he had reviewed files maintained in PTH's record room, randomly selected fourteen leases, and would confirm that the cars associated with the leases existed.  (<u>Id.</u>)  Menard never reviewed the sample leases, however, nor did he verify that the cars existed.  (Pltf. Ex. 38 at 294:23-295:17) And in January 1998, when Alliance employee John Torpey told Menard that a third-party audit of the car leasing program was necessary because Alliance did not have any "real picture of what the delinquency on these notes is" (Pltf. Ex. 18), Menard responded that he had shared the sample leases with the auditing firm of O'Rourke Sacher & Moultin and with the National Credit Union Administration ("NCUA") and had received no adverse comments.  (<u>Id.</u>)  Menard later admitted, however, that he had "no specific knowledge" whether either organization had ever reviewed these files.  (Pltf. Ex. 38 at 299:15-19)

        **4.**        <u>**Menard's Failure to Disclose to Alliance that Two**</u>
                         <u>**PTH Co-Owners Were Embezzling from PTH**</u>

In early to mid-August 1997, PTH co-owner Larry Sobel told Menard that two other co-owners of PTH – Mark Betz and Michael Inzitari – had stolen $500,000 from PTH.  (Pltf. Ex. 27 at 241:19-24, 242:19-23; Pltf. Ex. 28 at 440:5-8)  Similarly, Mark Archambault – who owned a company that eventually became the sales arm of

PTH – met with Menard in the summer of 1997 to ensure "that [Alliance] was aware of the Mark Betz and Mike Inzitari situation." (Pltf. Ex. 42 at 1621:19-25)

It is undisputed, however, that Menard did not inform Alliance that two of PTH's four co-owners had misappropriated $500,000 from PTH (Pltf. Ex. 27 at 241:19-24; Pltf. Ex. 28 at 440:5-8), nor did Menard inform Alliance that – although Betz's employment was terminated – Inzitari had been permitted to continue working at PTH and to continue drawing a $120,000 annual salary even after his theft was discovered. (Pltf. Exs. 27 at 243:23-24; Pltf. Ex. 28 at 440:5-9, 551:3-6)

Alliance did not learn about the Betz embezzlement until May 1998 – nearly a year later – when Menard, other Alliance employees, and Sobel met to discuss the shortfall in the escrow collateral account. (Def. Ex. 1 at 130:8-12) At that meeting, Sobel reported that Betz had stolen money from PTH and had been terminated. (Id.) Inzitari's embezzlement was not disclosed, however. Indeed, Menard never told Alliance about Inzitari's embezzlement. (Murray Aff., ¶ 53; Ambrose Aff., ¶ 8)

### 5.    Menard's Secret Conversations with PTH's Counsel

After Alliance filed an involuntary bankruptcy petition against PTH, Alliance CEO Murray instructed Menard not to have any further contact with PTH. (Pltf. Ex. 45) Despite Murray's directive, Menard continued to take calls from PTH's attorney about Menard's upcoming deposition in the bankruptcy case. (Pltf. Ex. 46 at 1398:19-1400:23) Alliance asserts that Menard never disclosed his continued discussions with PTH's counsel and that Menard's discussions with counsel and subsequent testimony undermined Alliance's position in the bankruptcy proceeding (Murray Aff., ¶ 51), which was subsequently dismissed. (Def. Ex. 49; Pltf. Ex. 21)

**6.**     **Menard's Business Venture with Sobel's Wife**

In July 1999, a month after Menard signed his termination agreement with Alliance, Menard and Larry Sobel's wife opened Southern Tire, a tire distribution company that also employed Menard's son-in-law and daughter. (Pltf. Ex. 34 at 1415:13-20; Pltf. Ex. 35 at 240:23-241:7)  Menard and Suzanne Sobel each invested $50,000 in Southern Tire, and they each owned a 50% interest. (Pltf. Ex. 34 at 1415:15-20; Def. Ex. 3 at 238:7-10)  After the company had been in business for about five months, however, Menard purchased Suzanne Sobel's interest for $5,000. (Pltf. Ex. 34 at 1418:8-9)  Three-and-a-half years, Menard sold the business to his daughter.[7]  (Id. at 1418:13-25)

## III.     CAUSATION EVIDENCE

As noted above, Alliance has offered evidence indicating that Menard repeatedly mischaracterized to his Alliance superiors and colleagues the financial condition and performance of PTH during the car leasing program.  It is undisputed, however, that during the existence of the program Alliance received information from a variety of sources indicating that it was financially troubled.  For example, between December 1996 and August 1998, Alliance received five separate audit reports describing steadily growing problems at PTH:  (1) a December 1996 audit issued by the independent auditing firm of O'Rourke Sacher & Moultin ("O'Rourke") (Def. Ex. 7); (2) a fall 1997

---

[7]  Alliance also alleges that Menard hid the fact that PTH did not have a car leasing license. (Pltf. Br. 3)  Although PTH falsely warranted to Alliance that it held such a license (Def. Exs. 3, § 7.0; 14, § 7.0), Alliance has offered no evidence that Menard knew that PTH had not obtained a license.  While Menard may have been negligent in failing to ensure that PTH held such a license (Pltf. Ex. 24 at 93-94), negligence does not establish dishonesty.  See Fed. Deposit Ins. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 205 F.3d 66, 73 (2d Cir. 2000) (for an employee to act with the manifest intent to harm his employer the employee must "act[] with the specific purpose or object to harm the insured").

report issued by the National Credit Union Administration ("NCUA") (Def. Ex. 18); (3) a

May 22, 1998 audit issued by O'Rourke (Def. Ex. 33); (4) a July 31, 1998 audit issued by

an internal auditor; (Def. Ex. 19); and (5) an August 5, 1998 follow-up internal audit.

(Def. Ex. 40)

    Beginning with the first audit in December 1996, auditors identified

deficiencies and risks in the program; those warnings became steadily more serious as

time passed.  For example, the December 1996 audit recommended that PTH increase its

due diligence and obtain additional financial information and documentation from PTH,

including title liens, copies of lease agreements, endorsements indicating Alliance's

participation in each lease, evidence of the lessees' payments, and PTH financial

statements.  (Def. Ex. 7)  The May 1998 audit noted that Alliance did not review "cash

flows, delinquency trends and repossession activity" and recommended that it obtain such

information from PTH.  (Def. Ex. 33)  The July 1998 internal audit warned that because

PTH's lessees were subprime, there was a great deal of credit risk; that a high level of

non-performing leases could reduce PTH's cash flow; and that the amount of protection

offered by the 1997 agreement's recourse provision depended on "PTH's continued,

successful operations." (Def. Ex. 19)  By August 5, 1998, auditors reported that "a severe

insolvency exist[ed]," that PTH had a capital deficiency of $3,455, 817, and that the

problems with the leasing program were "overwhelming."  (Def. Ex. 40 at 3)

    Alliance also received other documents showing PTH's deteriorating

financial condition.  For example, Alliance received PTH's December 31, 1997 financial

statement (Def. Ex. 33), which indicated that PTH was in serious financial distress, with

assets of $6,754,534 and liabilities of $9,171,608.  (Def. Ex. 34)  PTH delinquency

reports sent to Alliance at the end of August 1998 also made clear that there were serious problems with the car leasing program.  (Def. Exs. 1 at 156:18-16; 48; Pltf. Ex. 31 at 51:22-53:19)

There is no evidence that Alliance made meaningful changes to the car leasing program in response to the audit reports and the other documentary information it received.  Indeed, after receiving the dire August 1998 audit report, Alliance invested an additional $700,000 in PTH leases.  (Def. Ex. 1 at 158:7-8)

After the May 22, 1998 audit, Alliance employee John Murphy addressed Alliance's Board to express his "real concerns" about the leasing program, his opinion that the "relationship between PTH and the credit union seemed questionable,"  and his concern that "something had to be done immediately."  (Def. Ex. 39 at 48:4-50:10) Murphy explained that the lessees had "real low . . . credit scores," that they were leasing used cars, "that the amount [$14 million] was rather significant," that PTH had "no large experience in this area and we were their only customer," and that PTH had not fulfilled its obligation concerning the escrow collateral account.  (Id.)  There is no evidence that the Board took any action as a result of Murphy's presentation.  (Id. at 49:6-12)

## DISCUSSION

## I.   SUMMARY JUDGMENT PRINCIPLES

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact."  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "A fact is material for these purposes if it might affect

the outcome of the suit under the governing law." Overton v. New York State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004) (quotations omitted).  In ruling on a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

Because this Court's subject matter jurisdiction is based on diversity, the Court will apply New York law, which the parties agree governs.  See, e.g., JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (applying New York law to a contract because the parties agreed it governed their dispute); Powell v. Omnicom, 497 F.3d 124, 129 n.1 (2d Cir. 2007) (applying New York law to a contract – even though the Court stated that it was unclear whether New York or federal law applied – because the parties did not raise the issue and because they implicitly agreed that New York law applied).

## II.  CUMIS IS NOT ENTITLED TO SUMMARY JUDGMENT ON ALLIANCE'S DISHONESTY CLAIM

### A.  Legal Framework

The Dishonesty Provision is a standard clause in employee fidelity bonds and has been repeatedly analyzed by the Second Circuit.  See, e.g., Fed. Deposit Ins. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 205 F.3d 66 (2d Cir. 2000) (hereinafter National Union); Glusband v. Fittin Cunningham & Lauzon, Inc., 892 F.2d 208 (2d Cir. 1989); Leucadia, Inc. v. Reliance Ins. Co., 864 F.2d 964 (2d Cir. 1988).  In determining whether Alliance may recover under the bond, the central issue is whether Menard "committed dishonest . . . acts, with a manifest intent to harm [Alliance] and benefit himself [or another person or entity and thereby] directly caused [Alliance's] loss."  National Union, 205 F.3d at 70.  Accordingly, this Court must determine whether

15

there is evidence from which a rational jury could conclude that (1) Menard committed dishonest acts; (2) Menard had a "manifest intent" to cause a loss to Alliance; (3) Menard had a manifest intent to obtain a benefit for himself or "for any other person or entity"; and (4) Alliance's losses resulted directly from Menard's misconduct.  If Cumis "can establish, as a matter of law, that at least one of these requirements is not satisfied in this case, it would not be required to indemnify [Alliance]" as a matter of law.  Resolution Trust Corp. v. Fidelity & Deposit Co. of Maryland, 205 F.3d 615, 636 (3d Cir. 2000).  In considering whether there are material issues of fact here, the facts and holding of National Union – the leading Second Circuit case in this area – are instructive.

In National Union, the Second Circuit considered whether the actions of a bank trustee named Folks met the "manifest intent" standard.  In 1985, Union Savings Bank entered into a limited partnership agreement with an entity owned by Seymour Diesenhouse and formed Hampton Vistas Associates, a condominium development project.  Diesenhouse was hired as the construction manager for the Hampton Vistas project.  Unbeknownst to the Bank, Folks was a partner with Diesenhouse in two real estate ventures.  205 F.3d at 68.

In late 1987, three of Diesenhouse's employees told Folks that Diesenhouse – who eventually pleaded guilty to bank fraud – was stealing from the project.  Id. at 68-69.  Folks took steps to protect his interest in the projects that he shared with Diesenhouse but took no steps to protect the Bank or to inform it of Diesenhouse's wrongdoing.  The Bank subsequently loaned an additional $8 million to the Hampton Vistas project.  Id. at 69.  The project ultimately failed, causing the Bank to suffer losses in excess of $3 million, for which the FDIC sought recovery under a fidelity bond issued

by National Union.  Three of the Bank's trustees submitted affidavits in the subsequent

litigation swearing that if Folks had disclosed the allegations concerning Diesenhouse, a

full investigation would have ensued, Diesenhouse would have been removed, and

further funding of the Hampton Vistas project would have been suspended.  Id. at 69-70.

   In considering whether Folks had "acted with the intent required under a

fidelity bond," the National Union court stated that "[t]he test is . . . essentially a

subjective test with a necessary objective requirement in that an employee's actions can

circumstantially establish that the employee acted with the manifest intent to cause the

insured a loss."  205 F.3d at 72.  In discussing "what kind of conduct triggers coverage

under a fidelity bond," the Court noted that there is "a continuum of behavior ranging

from behavior manifesting an obvious intent to cause a loss to behavior that does not

indicate whether the employee intended to harm the insured."  Id. "Where the behavior

lies in the middle of two extremes, intent is often a disputed issue of fact for the jury."

Id. (citing Federal Deposit Insurance Corporation v. Oldenburg, 34 F.3d 1529, 1540 (10th

Cir. 1994) ("[w]here an individual's conduct falls somewhere between the two extremes

of embezzlement and simple poor judgment, intent becomes a question of fact which will

generally not be subject to summary judgment")).

   The National Union court further explained that

> whether a fidelity bond's manifest intent requirement has been satisfied is
> discerned by considering the relationship between the employee and his or
> her employer, the employee's knowledge that his conduct may cause the
> insured a loss, and all other surrounding circumstances bearing upon the
> employee's purpose.  Under Glusband and the New York cases, actions
> that amount to embezzlement or embezzlement-like conduct establish a
> fidelity bond's manifest intent element as a matter of law.  Actions that
> will possibly result in the benefit of the employer do not, as a matter of
> law, establish manifest intent. Furthermore, evidence that the employee
> acted recklessly can be a manifestation of the employee's intent to cause

17

> the insured a loss.  Finally, manifest intent does not require that the
> employee actively wish for or desire a particular result, but can exist when
> a particular result is substantially certain to follow from the employee's
> conduct.

Id. at 74.

        With that legal and factual backdrop, the Second Circuit had little

difficulty in affirming the district court's grant of summary judgment to the FDIC.  The

Court found that Folks had "committed dishonest acts under the fidelity bond" when he

failed to notify the Bank of Diesenhouse's wrongdoing.  With respect to whether Folks

had had the "manifest intent" to cause the Bank a loss as a matter of law, the Court held

that

> Folk's failure to disclose to the Bank that the general contractor of
> Hampton Vistas was stealing from the project was imprudent and reckless
> and a probable breach of his fiduciary duty as trustee of the Bank. . . .We
> conclude that Folks's conduct in remaining silent when the Bank chose to
> lend $8 million more to Hampton Vistas was substantially certain to cause
> the Bank a loss.  Moreover, Folks's failure to disclose that Diesenhouse
> inflated prices and accepted kickbacks certainly harmed the Bank in its
> capacity as partner in the joint venture, because these actions would
> diminish the profits or increase the losses for the joint venture.

Id. at 75.  The Court further found that Folks had intended to cause the Bank a loss,

because he protected his own interests while leaving the Bank exposed, thus

demonstrating that he "was attempting to benefit himself by concealing Diesenhouse's

misdeeds":  "Folks did more than risk a loss – he acted with personal certainty that loss

would result."  Id.

        The Court also readily found causation, because the FDIC had

demonstrated that "the Bank would not have issued its second loan if it had known of

Diesenhouse's wrongdoing."  Id. at 76.

As discussed below, under <u>National Union</u> there are material issues of fact that preclude granting summary judgment to Cumis on Alliance's dishonesty claim.

**B.      There Are Material Issues of Fact as to
          <u>Whether Menard Committed Dishonest Acts</u>**

Alliance has proffered abundant evidence demonstrating that Menard may have committed dishonest acts.  As an initial matter, it is undisputed that Menard never disclosed to Alliance that two co-owners of PTH had embezzled $500,000 from the Company, and that one of the embezzlers continued to be employed at PTH and to draw a $120,000 salary.  Given that Alliance was insulated from losses in the car leasing operation only if PTH remained financially viable, a rational jury could find that Menard's failure to disclose this enormous loss and PTH's decision to retain one of the embezzlers constituted – as did Folks's non-disclosure of theft in <u>National Union</u> – a dishonest act.

In addition to the undisputed evidence concerning Menard's failure to disclose the Inzitari embezzlement and PTH's retention of him, Alliance has offered evidence tending to show, <u>inter alia</u>, that (1) Menard consistently misrepresented PTH's financial performance and lease delinquency rate to his Alliance superiors and colleagues; (2) deprived Alliance of reports that would have revealed PTH's true financial condition; and (3) misrepresented an alleged audit he had conducted concerning PTH's leasing program and reviews purportedly conducted by O'Rourke and NCUA.

**C.      There Are Material Issues of Fact as to Whether Menard
          <u>Had the Manifest Intent to Cause a Loss to Alliance</u>**

Under <u>National Union</u>, it is clear that Menard's

actions can circumstantially establish that [he] acted with the manifest intent to cause [Alliance] a loss. . . . Furthermore, evidence that the employee acted recklessly can be a manifestation of the employee's intent

to cause the insured a loss.  Finally, manifest intent does not require that the employee actively wish for or desire a particular result, but can exist when a particular result is substantially certain to follow from the employee's conduct.

National Union, 205 F.3d at 72, 74 (citing Resolution Trust Corp., 205 F.3d at 642) ("proof of the employee's recklessness and the substantial likelihood of loss factor into the ultimate inquiry into the employee's subjective state of mind").  Given that Alliance was substantially certain to sustain a loss if PTH did not remain financially viable, a rational jury could find that Menard's alleged agreement with Sobel that PTH would not provide to Alliance the delinquency and other reports required under the agreement, and Menard's alleged failure to transmit to Alliance information concerning PTH's rapidly deteriorating financial condition, were likely – given the subprime market in which PTH was operating and the amount Alliance was investing in PTH leases – to result in a significant loss to Alliance.

With respect to Menard's subjective intent, Alliance has also offered evidence that Menard had secret and prohibited conversations with PTH's counsel concerning the involuntary bankruptcy petition Alliance had filed against PTH.  On November 6, 1998, Alliance CEO Murray instructed Menard to cease all communications with PTH because Alliance had initiated involuntary bankruptcy proceedings against PTH.  (Pltf. Ex. 45)  Despite this clear directive, Menard secretly continued to take telephone calls from PTH's bankruptcy attorney and, according to Alliance, gave inaccurate testimony during the bankruptcy proceeding that undermined Alliance's position.  (Pltf. Ex. 46 at 1398:19-25; Pltf. Ex. 19; Murray Aff., ¶ 51)

In sum, this Court cannot determine at this stage of the litigation and as a matter of law that Menard did not have a "manifest intent" to cause a loss to Alliance

within the meaning of the employee fidelity bond.  See National Union, 205 F.3d at 72

("intent is often a disputed issue of fact for the jury"); Oldenburg, 34 F.3d at 1540

("[w]here an individual's conduct falls somewhere between the two extremes of

embezzlement and simple poor judgment, intent becomes a question of fact which will

generally not be subject to summary judgment").[8]

> **D.     There Are Material Issues of Fact as to Whether Menard
> Had the Manifest Intent to Obtain a Financial Benefit for Himself**

Alliance has offered evidence tending to show that Menard may have had

a manifest intent to obtain a financial benefit for himself.  First, Alliance notes that PTH

---

[8]  Cumis errs in contending that Glusband v. Fittin Cunningham & Lauzon, Inc., 892 F.2d
208 (2d Cir. 1989) and Leucadia, Inc. v. Reliance Ins. Co., 864 F.2d 964 (2d Cir. 1988)
require that it be granted summary judgment.  Both of these cases are distinguishable.

In Leucadia, an employer alleged that its employee had dishonestly loaned out millions of
dollars.  See 864 F.2d at 965.  The Second Circuit held, however, that no reasonable jury
could have found that the employee was dishonest within the meaning of the fidelity
bond.  See id. at 966.  After analyzing the real estate loans at issue, the Court found that
the employee believed that the loans he initiated would eventually profit his employer,
and this belief was partially vindicated because the employer recouped its losses on one
account.  See id. at 972-74.

In Glusband, a receiver for an investment management corporation sought recovery on a
fidelity bond where the corporation's owner – instead of following the conservative
investment strategy he had promised investors – pursued a reckless trading strategy that
resulted in the corporation's insolvency.  892 F.2d at 209.  The Second Circuit reversed a
jury's finding for the insured, partially because the owner did not have the manifest intent
to cause a loss to the company.  The Court found that the "evidence indicated that [the
owner] intended to benefit [the company], no matter how reckless and imprudent his
conduct may have been."  Id. at 210.

The National Union court characterized Leucadia and Glusband as cases where "we were
concerned with what the employee 'hoped,' however misguidedly, would be the outcome
of his actions."  National Union, 205 F.3d at 73.  Here, there is evidence – such as
Menard's failure to alert Alliance to Inzitari's embezzlement and Menard's secret
conversations with PTH's bankruptcy counsel – that Menard was trying to do more than
help Alliance.  Accordingly, Leucadia and Glusband are not controlling, and there is an
issue of fact as to whether Menard had the manifest intent to cause a loss to Alliance.

offered Menard an option to purchase a 5% interest in PTH and suggested that he would later become PTH's CEO.  Although Menard has testified that he never pursued either the option proposal or the CEO position, he did not testify that he closed the door on these opportunities, and he did not disclose them to Alliance.  Indeed, Menard testified that he understood that the option opportunity remained available throughout the life of the car leasing program.  (Pltf. Ex. 32 at 397:19-22, 400:4-401:6)  Because of the opportunities PTH had made available to Menard, he arguably had a stake in PTH's success and a motive to withhold negative information from Alliance that could damage PTH's interests.  See Resolution Trust Corp., 205 F.3d at 649 (reversing grant of summary judgment to insurer where "future lucrative employment opportunities, salaries and signing bonuses" gave employees a motive to fraudulently cause their employer to approve extensions of a risky line of credit and consent to the advancement of additional funds).

Menard's business dealings with Sobel's wife soon after his termination by Alliance likewise raises an issue as to whether he had a manifest intent to obtain a financial benefit for himself during the time that he dealt with PTH.  Menard and Sobel's wife each invested $50,000 in Southern Tire a month after Menard signed his termination agreement with Alliance.  Within five months of this initial investment, however, Menard bought out Suzanne Sobel's interest for $5000.[9]  (Pltf. Ex. 34 at 1415:15-20, 1418:8-9;

---

[9]  While Cumis cites Leucadia, 864 F.2d at 974, for the proposition that an employee's subsequent business relationship with a third party does not establish that the employee necessarily had an earlier intent to favor that third party and to benefit himself at his employer's expense, the Menard-Sobel transaction at issue here is more difficult to dismiss out of hand, particularly given that Larry Sobel presented Menard with the investment option and CEO position opportunities.

Def. Ex. 3 at 238:7-10)  Given this record, this Court cannot find as a matter of law that

Menard did not have a manifest intent to obtain a financial benefit for himself, and that

he did not engage in acts which permitted the Alliance-PTH relationship to continue, to

the great detriment of his employer, in exchange for this hoped-for benefit.  See

Resolution Trust Corp., 205 F.3d at 644 ("an insured may survive a motion for summary

judgment by proffering evidence suggesting that the employee acted knowing that it was

substantially certain that his or her conduct would cause the insured to sustain a loss that

would inure to the employee's benefit").[10]

> **E.      There Are Material Issues of Fact as to Whether Alliance's
>           Losses Resulted Directly from Menard's Alleged Misconduct**

In National Union, the Second Circuit considered an employee fidelity

bond that, like the bond here (Pltf. Ex. 50), only "provide[d] coverage for 'loss resulting

directly from dishonest or fraudulent acts. . . .'"  See 205 F.3d at 76 (emphasis in

original).  The court explained that a

> "loss is directly caused by the dishonest or fraudulent act within the
> meaning of the Bond where the bank can demonstrate that it would not
> have made the loan in the absence of the fraud."

Id. (quoting First Nat'l Bank of Louisville v. Lustig, 961 F.2d 1162, 1167 (5th Cir.

1992)).  The Court went on to hold that the insured "was entitled to recover under the

_____

[10]  Alliance also alleges that Menard held a current equity interest in PTH in the form of
shadow stock.  (Pltf. Br. at 1, 18)  Because Alliance bases this allegation on Philip
Farber's affidavit which, in turn, is based on hearsay, the Court will not consider this
assertion.  See Patterson v. County of Oneida, New York, 375 F.3d 206, 219 (2d Cir.
2004) (Rule 56(e)'s requirement that the affiant have personal knowledge and be
competent to testify to the matters asserted in the affidavit also means that an affidavit's
hearsay assertion that would not be admissible at trial if testified to by the affiant is
insufficient to create a genuine issue for trial.")

bond because the [insured] showed that the Bank would not have issued its second loan if it had known of [the employee's] wrongdoing."  Id.  Accordingly, under National Union, the issue is whether Cumis has demonstrated that no rational jury could find that Alliance would have ended its participation in the car leasing program absent Menard's allegedly dishonest acts.  Cumis argues that Alliance cannot satisfy this element, because it received extensive information detailing serious problems with the car leasing program and nevertheless continued its participation in the program.

The Court concludes that there are material issues of fact as to whether Alliance would have continued its participation in the car leasing program absent Menard's alleged dishonest conduct.  In particular, Alliance senior vice president Robert Ambrose has submitted an affidavit saying that he would not have voted to continue Alliance's participation in the car leasing program if Menard had disclosed Inzitari's embezzlement, PTH's decision to continue his employment, and PTH's true rate of lease delinquency.  (Ambrose Aff., ¶ 10)  Similarly, Alliance CEO Murray submitted an affidavit stating that he would have "immediately suspended the program" if Menard had disclosed that he had been offered employment at PTH and an option to purchase an interest in the Company.  (Murray Aff., ¶ 55).

Alliance has offered a litany of additional, allegedly dishonest actions taken by Menard that allegedly caused Alliance to continue its participation in the program, including:  Menard's agreement with Sobel that PTH would not submit delinquency and other reports to Alliance (Pltf. Ex. 28 at 243:20-244:5); Menard's failure to disclose to Alliance financial information contained in PTH reports he received (Pltf. Ex. 59 at 827:8-15); and Menard's alleged sham audit, which was used to assuage

24

Alliance's concerns about the program.  (Def. Ex. 16)  While Cumis argues – with considerable force – that Alliance ignored numerous red flags concerning PTH, it is a jury question whether Alliance would have continued its participation in the program absent Menard's alleged misconduct.

Because there are material issues of fact concerning Menard's alleged dishonesty, his manifest intent to cause harm to Alliance and to obtain a benefit for himself, and whether Alliance's losses resulted directly from Menard's misconduct, Cumis is not entitled to summary judgment on Alliance's Dishonesty Provision claim.

## III.    CUMIS IS ENTITLED TO SUMMARY JUDGMENT ON ALLIANCE'S UNFAITHFULNESS CLAIM

Alliance also seeks to recover under a provision of the bond captioned "Failure to Faithfully Perform His/Her Trust."  This provision provides that

> "[f]ailure to faithfully perform his/her trust" means acting in conscious disregard of your established and enforced share, deposit or lending policies.
>
> "Failure to faithfully perform his/her trust" does not mean:
>
> a.  Negligence, mistakes or oversights; or
>
> b.  Acts or omissions resulting from inadequate training; or
>
> c.  Unintentional violation of laws or regulations; or
>
> d.  Unintentional violations of your policy or procedures; or
>
> e.  Acts or omissions known to, acquiesced in, or ratified by your Board Of Directors; or
>
> f.  Acts of an "employee" for which you could have made claim under Employee Or Director Dishonesty Coverage.

(Def. Ex. 50)

The parties dispute the plain meaning of this provision.  Cumis alleges that the only issue before the Court is whether Menard "consciously disregard[ed]" Alliance's "lending policies."  Because it is undisputed that Alliance never implemented any lending criteria concerning the car leasing program, Cumis argues that there was no lending policy in existence for Menard to consciously disregard.

Alliance counters with two arguments.  First, Alliance argues that the term "policy" is not defined by the bond and should be interpreted broadly, because in New York "insurance contracts are normally construed strictly against the insurer."  <u>Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.</u>, 19 F.3d 78, 81 (2d Cir. 1994).  Accordingly, Alliance argues that Menard violated four alleged Alliance "lending policies":  (1) the 1996 and 1997 agreements between Alliance and PTH; (2) an advisory opinion from the NCUA; (3) Alliance's "Personnel Policy"; and (4) Alliance's "Conflicts of Interest" policy.  Second, Alliance argues that because subsection (c) of the Faithfulness Provision excludes coverage for unintentional violation of laws or regulations, <u>intentional</u> violations of laws or regulations – such as those allegedly committed by Menard – must be covered by the bond.

A.    <u>**Applicable Law**</u>

Summary judgment is appropriate as to this claim only if the bond's language is plain and unambiguous.  Whether a contract is ambiguous is a question of law to be resolved by the Court.  <u>Brass v. Am. Film Tech., Inc.</u>, 987 F.2d 142, 148-49 (2d Cir. 1993).  Under New York law, contract language is unambiguous where it has a "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of

opinion."  Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000)

(quotation omitted).

        With respect to New York insurance contracts, the Second Circuit has

stated that courts should

> construe the language at issue as would the ordinary [person] on the street
> or ordinary person when he [or she] purchases and pays for insurance, or,
> in a case such as this one involving a policy issued to a business, by
> examining the reasonable expectation and purpose of the ordinary
> business [person] when making an ordinary business contract.  The term is
> not given a narrow, technical definition by the law.  It is construed, rather,
> in accordance with its understanding by the average [person] . . . who, of
> course, relates it to the factual context in which it is used.

First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 167-68 (2d Cir. 1998)

(alterations in original) (quoting Michaels v. City of Buffalo, 85 N.Y.2d 754, 757

(1995)).  "Not surprisingly, a favored source of the average person's understanding of a

term is the dictionary."  Id. (citing Jakobson Shipyard, Inc. v. Aetna Cas. & Surety Co.,

961 F.2d 387, 389 (2d Cir. 1992)).

      **B.**    **The Four "Policies" Cited by Alliance Are Not Lending**
                **Policies within the Meaning of the Faithfulness Provision**

        Because the parties dispute the meaning of the phrase "lending policies,"

the Court first turns to the dictionary definition of "policy."  "Policy" has been defined as

"a high-level overall plan embracing . . . general goals and acceptable procedures."

Merriam-Webster Online Dictionary 2009.  Accordingly, a "lending policy" under the

Faithfulness Provision is a high-level overall plan embracing Alliance's goals and

procedures as they relate to lending.

1.      **The 1996 and 1997 Alliance-PTH**
        **Agreements Are Not Alliance Lending Policies**

Contrary to Alliance's arguments, the 1996 and 1997 Alliance-PTH

agreements cannot reasonably be construed as Alliance lending policies.  First, it is

undisputed that these agreements did not concern loan transactions; both agreements

explicitly provide that Alliance's participation in the lease transactions "shall in no way

be construed as a loan by Credit Union to PTH."  (Def. Ex. 9, § 4.0(c); Ex. 14 § 4.0(c))

Second, Alliance was neither a lender nor a borrower under the agreements.  Instead,

Alliance was merely given an option to purchase either a 75% or 95% interest in each

lease.  (Def. Ex. 9, § 4.0(a); Ex. 14 § 4.0(a))  Finally, the Alliance-PTH agreements state

that Alliance will "make its own independent determination of the Member's

creditworthiness in accordance with the loan policies of the Credit Union. . . ."  (Def. Ex.

9, § 4.12(a); Ex. 14, § 4.12(a)) (emphasis added)  The agreements do not set forth any

specific lending criteria, and instead envision that Alliance will consult its internal

lending policies in deciding whether to purchase interests in the leases.  For all of these

reasons, the 1996 and 1997 Alliance-PTH agreements cannot be regarded as "lending

policies" within the meaning of the Faithfulness Provision.

2.      **The NCUA Letter, Alliance's "Personnel**
        **Policy," and Alliance's "Conflicts of**
        **Interest" Policy Are Not Alliance Lending Policies**

Alliance next argues that the NCUA's August 10, 1994 advisory letter

concerning federal credit union participation in car leasing programs – which was

provided to Menard on November 1, 1994 – constitutes an Alliance "lending policy"

within the meaning of the Faithfulness Provision.  (Pltf. Ex. 36)  This letter is not an

Alliance lending policy under the bond, however, because there is no evidence that it was ever adopted by Alliance as a policy.

Finally, Alliance's "Personnel Policy" and "Conflicts of Interest Policy" cannot reasonably be construed as lending policies within the meaning of the bond. Although these documents are policies, they do not relate to lending. The "Personnel Policy" addresses such topics as the employment of minors, alcohol use, and vacation eligibility. (Pltf. Ex. 23) Similarly, Alliance's "Conflicts of Interest Policy" merely provides that Alliance employees cannot use their positions for personal gain and cannot play a role in Alliance business matters that might affect their own pecuniary interest. (Id.) Because these policies do not discuss lending, they are not lending policies.

**C.      Subsection c of the Faithfulness Provision Does Not Apply**

The Faithfulness Provision states: "'[f]ailure to faithfully perform his/her trust' means acting in conscious disregards of your . . . lending policies." (Def. Ex. 50) The Faithfulness Provision goes on to state that a "'[f]ailure to faithfully perform his/her trust' does not mean: . . . c. [u]nintentional violations of laws or regulations." (Id.) Alliance argues that Menard's conduct is covered by the Faithfulness Provision because he intentionally violated the law.

Alliance's argument is absurd, because it would mean that Cumis agreed to insure Alliance for every intentional violation of law. Instead, application of the Faithfulness Provision begins with a determination of whether an employee has acted in violation of Alliance's lending policies. Alliance has not cited any lending policies to this Court, however – presumably because it had no such policies in place that applied to the car leasing program.

Because Alliance has not cited any lending policies that Menard allegedly violated, it cannot prevail on its claim under the Faithfulness Provision.  Accordingly, Cumis is entitled to summary judgment on that claim.[11]

## IV.   CUMIS'S MOTION TO STRIKE WILL BE DENIED AS MOOT

Cumis has moved to strike the affidavit of Philip Farber, paragraphs 4-10, 12-14, 18-22, 24, and 31 of Robert Ambrose's affidavit, and paragraphs 5, 23, 27-30, 37, 41-42, 45-47, and 51 of Richard Murray's affidavit, because they contain hearsay, are not based on personal knowledge, or are conclusory allegations.

Rule 56(e) of the Federal Rules of Civil Procedure states that affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  A court is not required to conduct a line-by-line analysis of a challenged affidavit, however, and may simply disregard those portions that are inadmissible.  See Rus, Inc. v. Bay Indus., Inc., 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003) ("To the extent that an affidavit or declaration contains material that does not comply with Rule 56(e), the Court may strike those portions, or may simply disregard them." (citation omitted); Flaherty v. Filardi, No. 03 Civ. 2167(LTD)(HBP), 2007 WL 163112, at * 4 (S.D.N.Y. Jan. 24, 2007) (denying a

---

[11]  Alliance employee David Nemeth was responsible for reviewing lease applications before he was fired for theft in October 1997.  (Def. Ex. 1 at 26:2-6, 27:11-23)  As part of a settlement of Alliance's fidelity bond claim concerning Nemeth's theft, Alliance gave Cumis a release covering "any and all claims, demands or causes of action . . . caused by or alleged to have been caused by . . . David Nemeth . . . ."  (Def. Ex. 4, 5)  Cumis now argues that this release prohibits Alliance from recovering for any losses that flow from leases that Nemeth approved.  This release appears to have no application here.  Alliance is not seeking to recover for acts committed by Nemeth, but instead for dishonest acts allegedly committed by Menard.

motion to strike and explaining the court "will not expend limited judicial resources scrutinizing each line" of an affidavit).

Here, there is no basis for disregarding any affidavit in its entirety. The Court has disregarded, however, those portions of the affidavits that are not based on personal knowledge, rely on hearsay, or are otherwise inadmissible. See Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir.1999) abrogated on other grounds by Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000) (court may disregard "portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements"). The Court has likewise disregarded the affidavits to the extent that they are inconsistent with that witness's deposition testimony. Because the Court only relied on admissible evidence in reaching its summary judgment decision, Cumis's motion to strike is denied as moot.

## CONCLUSION

For the reasons set forth above, Cumis's motion for summary judgment on Alliance's first cause of action is DENIED and its motion for summary judgment on Alliance's second cause of action is GRANTED. Cumis's motion to strike the affidavits of Murray, Ambrose and Farber is DENIED as moot. The Clerk of the Court is directed to terminate the motions. (Docket Nos. 40, 52)

Dated:       New York, New York
             September 10, 2009

                         SO ORDERED.

                         Paul G. Gardephe
                         United States District Judge

31